**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

vs.                                             CASE NO. 3:19-cr-164(S1)-J-20JRK

GERALD DEVAUGHN MCGEE, JR.

---

### REPORT AND RECOMMENDATION[1]

### I. Status

This cause is before the Court on Defendant's Motion to Suppress Physical Evidence Seized and to Suppress Statements and Memorandum of Law (Doc. No. 24; "Motion"), filed October 30, 2019.   The Government responded in opposition.   See United States' Amended Response in Opposition to Defendant's Motion to Suppress (Doc. No. 36; "Response"), filed November 14, 2019.[2]   An evidentiary hearing was held over the course of four days: November 14, 2019, December 9, 2019, December 17, 2019, and June 23, 2020.   See Minute Entries (Doc. Nos. 39, 52, 56, 89); Transcript of November 14, 2019 Hearing (Doc. No. 37; "11/14 Tr."); Transcript of December 9, 2019 Hearing (Doc. No. 60; "12/9 Tr."); Transcript of December 17, 2019 Hearing (Doc. No. 58; "12/17 Tr."); Transcript of June 23, 2020 Hearing (Doc. No. 90; "6/23 Tr.").

---

[1]     "Within 14 days after being served with a copy of th[is] recommended disposition [of a motion to suppress evidence and statements], … a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Crim. P. 59(b)(2). "Failure to object in accordance with this rule waives a party's right to review." Id.; see also 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; Local Rule 6.02.

[2]     The Government in the Response also addressed a then-pending motion seeking to disclose a confidential informant (Doc. No. 25).  That motion was ruled on by an Order (Doc. No. 40), entered November 19, 2019.

After the first three portions of the evidentiary hearing, at the direction of the Court, the parties filed supplemental memoranda in support of their respective positions. <u>See</u> Minute Entry (Doc. No. 56); Defendant's Post-Hearing Memorandum in Support of His Motion to Suppress Physical Evidence Seized and to Suppress Statements and Memorandum of Law (Doc. No. 64; "Defendant's Memo"), filed February 19, 2020; United States' Supplemental Response in Opposition to Defendant's Motion to Suppress (Doc. No. 70; "Government's Memo"), filed March 3, 2020.[3]  The undersigned also held a status hearing regarding the Motion on June 11, 2020, to clarify an outstanding matter. <u>See</u> Minute Entry (Doc. No. 84); Transcript (Doc. No. 85; "6/11 Tr."). The Motion is ripe for consideration.

## II. Procedural Background

Defendant was initially arrested in Putnam County on October 21, 2018 and charged with various state crimes. <u>See</u> 11/14 Tr. at 46-47. The case was presented to the U.S. Attorney's Office within a week after the arrest. <u>See</u> 11/14 Tr. at 55. About eleven months later, on September 26, 2019, the grand jury returned a three-count Indictment (Doc. No. 1) charging Defendant with knowingly and intentionally possessing with intent to distribute a controlled substance on or about October 21, 2018, which violation involved 500 grams or more of a mixture and substance containing a detectable amount of cocaine, and prior to the commission of such offense, having a final conviction for serious drug felonies for which he served more than 12 months' imprisonment and for which he was released from serving a term of imprisonment related to those offenses within 15 years of

---

[3]        The parties were provided an opportunity to request oral argument within seven days of the filing of the Government's Memo, failing which the Motion would be deemed ripe for consideration. <u>See</u> Minute Entry (Doc. No. 56).   Neither party has requested oral argument, and the undersigned finds that oral argument is not necessary to make a recommended ruling on the issues presented.

2

the commencement of the instant offense, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) (count I); knowingly and intentionally possessing with intent to distribute a controlled substance on or about October 21, 2018, which violation involved 28 grams or more of a mixture and substance containing a detectable amount of cocaine base, and prior to the commission of such offense, having a final conviction for serious drug felonies for which he served more than 12 months' imprisonment and for which he was released from serving a term of imprisonment related to those offenses within 15 years of the commencement of the instant offense, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) (count II); and knowingly possessing in interstate commerce a firearm on October 21, 2018, having previously been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e) (count III). An arrest warrant was issued on the same date the Indictment was returned (Doc. No. 4). On September 30, 2019, the Government filed an Information and Notice of Prior Conviction Under 21 U.S.C. § 851 (Doc. No. 5) seeking enhanced penalties as to Counts I and II because of prior serious drug felony convictions.[4]

Defendant was arrested federally on October 2, 2019, and he made his initial appearance before the undersigned on the same date. See Minute Entry (Doc. No. 7).   He was arraigned on October 8, 2019, and he pleaded not guilty. See Minute Entry (Doc. No. 18).   Thereafter, the Motion was filed.   After the filing of the Motion but before the evidentiary hearing, the grand jury returned a Superseding Indictment on October 31, 2019 (Doc. No. 28) charging the same substantive offenses but making some changes to the

---

[4]     Defendant was on federal supervised release in Case No. 3:06-cr-419-J-20JBT when the instant Indictment was returned. He faces a Superseding Petition in that case alleging the criminal conduct for which he was indicted in this case.

alleged prior convictions.   An Amended Information and Notice of Prior Conviction Under 21 U.S.C. § 851 (Doc. No. 30) was filed on November 1, 2019.   Defendant was arraigned on the Superseding Indictment on November 4, 2019, and he pled not guilty.   <u>See</u> Minute Entry (Doc. No. 32).   Thereafter, the proceedings set forth in Section I, above, were held.

### III.   Summary of Recommendation

The Motion seeks to suppress: 1) physical evidence—including cocaine, crack cocaine, marijuana, gun(s), currency, bank bags, ammunition, and drug paraphernalia— seized from Defendant's residence on October 21, 2018 pursuant to a search warrant; and 2) any statements he made that same day before, during, and after the execution of the search warrant.   Motion at 1.   The Motion also originally sought to suppress "[a]ny search of [Defendant's] cell phone," Motion at 1, which Defendant later expanded to include any seizure of any cellular phone(s), <u>see</u> Defendant's Memo at 3.   As set forth more fully below, it is unclear whether cellular phones were seized pursuant to the search warrant. <u>See</u> 11/14 Tr. at 32, 72; <u>see also</u> 6/11 Tr. at 9-10.   But, the Government has affirmatively represented that, if a cellular phone or phones were seized, it does not intend to introduce evidence of the seizure at trial.   <u>See</u> 6/11 Tr. at 10.   No search of any cellular phone has occurred to date, and the Government does not intend to search any cellular phone in the future.   <u>See</u> 6/11 Tr. at 9.   Accordingly, the parties agree that the request to suppress any search or seizure of cellular phone(s) is moot.   <u>See</u> 6/11 Tr. at 10.

As grounds for seeking to suppress the remaining physical evidence and the statements, Defendant mainly argues the following points: 1) a search warrant for his residence was issued without requisite probable cause; 2) the application for the warrant contained numerous mistakes and omissions that are fatal to the probable cause finding

made by the issuing judge; 3) the warrant could not be relied upon by law enforcement in good faith; 4) statements Defendant made before, during, and after the execution of the search warrant are "fruits of the poisonous tree" because there was no probable cause to issue a search warrant; and 5) the statements should be suppressed because of the alleged failure by law enforcement to read Defendant <u>Miranda</u> rights and because the statements were involuntarily made.

Rejecting Defendant's arguments, the undersigned recommends that the Motion be **denied** as to the evidence the Government seeks to introduce at trial (physical evidence (except any cellular phone) seized during the execution of the search warrant on October 21, 2018, and statements made by Defendant on October 21, 2018) and **denied as moot** as to evidence the Government does not seek to introduce (any seizure or search of a cellular phone).

### IV. Evidentiary Hearing[5]

**A.   Witnesses/Exhibits**

The Government presented one witness at the evidentiary hearing: Michael Kelly, a Detective with the Putnam County Sheriff's Office, who is assigned to the Drug Enforcement Administration ("DEA") task force ("Detective Kelly").[6]   In addition, the

---

[5]      Certain credibility findings are made in the Findings of Fact Section.   In making these credibility determinations, the undersigned considered various factors including the witnesses' demeanor, the consistencies or inconsistencies within the witnesses' testimony, and any interest the witnesses may have in the outcome of the hearing; but, the undersigned did not consider the official rank or status of the witnesses. <u>United States v. Ramirez-Chilel</u>, 289 F.3d 744, 749-50 (11th Cir. 2002); <u>see also</u> <u>Anderson v. City of Bessemer City</u>, 470 U.S. 564, 575 (1985) (indicating various factors to consider when making credibility determinations, such as demeanor, inflection of voice, and whether the testimony is "so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it").   The undersigned also considered the specific circumstances leading to any disputed testimony, as set forth more fully below.

[6]      Detective Kelly has been a member of the DEA task force, investigating major narcotics crimes, for almost eight years.   11/14 Tr. at 7.   Prior to that, he "ran the narcotics unit at the Palatka Police Department."   11/14 Tr. at 7.   Prior to that, from about 1998 through 2005, he worked as a patrol deputy and a school resource officer for the Putnam County Sheriff's Office.   11/14 Tr. at 7.   He has received

Government submitted six exhibits that were received without objection.  See Gov.'s Ex. List (Doc. No. 39-1) and attached exhibits (Doc. Nos. 39-2 through 39-6); Minute Entry (Doc. No. 89) (documenting introduction of exhibit six) and attached exhibit (Doc. No. 89-1).[7]  Defendant presented J.P., Defendant's fourteen-year-old nephew,[8] and Defendant recalled Detective Kelly.  Defendant submitted three exhibits that were received without objection.  See Def.'s Ex. List (Doc. No. 56-1) and attached exhibits (Doc. Nos. 56-2 through 56-4).

**B.  Findings of Fact**

### 1.  Events Leading to October 21, 2018

Detective Kelly testified that he became involved in an investigation of Defendant because law enforcement received information from a particular confidential informant ("CI"), as well as anonymous tips from others, that Defendant was involved in dealing large amounts of cocaine and crack cocaine in "the East Palatka, San Mateo area."  11/14 Tr. at 8-9, 57.  Detective Kelly had worked with this CI before: she "was a DEA informant" who had provided reliable information in at least one other investigation.  11/14 Tr. at 9, 11, 58.

---

special training in narcotics, and he has worked more than 400 federal and state investigations involving narcotics.  11/14 Tr. at 7-8.

[7]     Unless otherwise noted, all citations to exhibits containing multiple pages follow the pagination assigned by the Court's electronic filing system (CM/ECF). In addition, the first time a document or exhibit is cited, the CM/ECF "document" number is provided; subsequent citations do not include this document number.  Although CM/ECF "document" numbers are provided for exhibits, two of them are actually compact discs and are not available online.  Physical copies of all exhibits, including the compact discs, are on file at the Clerk's Office.

[8]     Because J.P. is a minor, he will only be referred to by his initials.  At the time of the hearing, J.P. was attending high school full-time, making straight A's and playing basketball.  12/9 Tr. at 14.  He was enrolled in college courses through the high school, putting him on track to have an associate's degree once he graduated from high school.  12/9 Tr. at 14.  Defense counsel sufficiently established that he knows the difference between telling the truth and telling a lie, and that being under oath, he must tell the truth regardless of whether it is good or bad for Defendant.  See 12/9 Tr. at 14-16.

The CI worked in exchange for cash, ultimately receiving a total of $5,500 for work on another investigation in late September 2018 ($4,000) and this one in November 2018 ($1,500).   11/14 Tr. at 10, 58, 88.   The CI has a criminal history that includes nol-prossed charges of battery and criminal mischief in approximately 2013 and a felony charge of insurance fraud in 2015 to which she pled nolo contendre and adjudication was withheld. 11/14 Tr. at 12, 59.

The CI had information about Defendant because the two had been in some type of "prior relationship" that Detective Kelly thinks was romantic.   11/14 Tr. at 11, 61. According to Detective Kelly, at the time the CI started working on this investigation, the relationship continued to be "conversational . . . if not more."   11/14 Tr. at 89.   Detective Kelly did not determine why the CI was interested in providing this information.   11/14 Tr. at 11, 61.   Detective Kelly thought the CI's motive in cooperating was to be paid.   11/14 Tr. at 88-89.

In September 2018, the CI informed Detective Kelly that Defendant was going to be travelling "south" to obtain some cocaine. 11/14 Tr. at 12, 53.   She told Detective Kelly the type of vehicle Defendant drove, which Detective Kelly confirmed using "driver databases" and physical surveillance.   11/14 Tr. at 13.   The CI also indicated that she had talked with Defendant over the phone.   11/14 Tr. at 12.   She provided phone numbers for Defendant, at least one of which was confirmed as being his through a master name search of the "Putnam County database."   11/14 Tr. at 13.   Detective Kelly ran a criminal background check on Defendant and learned he was on federal supervised release for a drug offense,[9] and Defendant has multiple drug-related convictions.   11/14 Tr. at 13, 50, 53, 87.

---

[9]      Detective Kelly actually testified Defendant "was on federal probation," but the docket in Case No. 3:06-cr-419-J-20JBT reflects he is serving a term of supervised release.

On about October 3, 2018, Detective Kelly applied for and received a GPS ping on Defendant's cellular phone, (386) 972-0253.   11/14 Tr. at 14; 12/9 Tr. at 7; 12/17 Tr. at 7-8.   The application was approved by the Honorable Patti Christiansen, Circuit Judge for the Seventh Judicial Circuit (Putnam).   Def.'s Exs. 1, 2; 12/17 Tr. at 7-8.   Detective Kelly used the GPS ping data to confirm what the CI told him about various locations where Defendant would be, including his then-current home at 105 Broadway Street ("Broadway residence") and his former residence on San Juan Avenue ("San Juan residence"), a house that the CI owned but did not live in.   11/14 Tr. at 16; 12/17 Tr. at 13-14, 21-22.

Detective Kelly also had the CI place recorded phone calls to Defendant.[10]   11/14 Tr. at 17.   The first call was made on October 4, 2018.   11/14 Tr. at 17; Gov's Ex. 1 (recording of call).   During the call, the CI confronted Defendant about her belief that Defendant had been cooking crack cocaine at the San Juan residence.   11/14 Tr. at 17, 20, 65-66, 89; Gov.'s Ex. 1.   She said she saw "white shit on th[e] counter," to which Defendant replied it was baking soda (a common ingredient in cooking crack cocaine). Gov.'s Ex. 1; see 11/14 Tr. at 19.   Defendant discussed buying "bullshit" from others, and there being a drought, lamenting that "they want 14 a piece."   Gov.'s Ex. 1.   According to Detective Kelly, that meant an ounce of cocaine was selling for $1400.   11/14 Tr. at 19.

---

[10]    The recorded calls were actually "initiated" by Detective Kelly, rather than the CI, because he used "a three-way dialing program" in which he "dial[s] direct to the source, and also the target number, which is the number [he and the CI were] trying to get ahold of."   11/14 Tr. at 17.   The program allows Detective Kelly to "connect" two phone numbers, making it appear "that the source [(the CI)] is actually calling the target [(Defendant)]."   11/14 Tr. at 17.   The program also allows Detective Kelly to hear the conversation in real time, and to record the conversation.   11/14 Tr. at 17.   For ease of reference, the undersigned refers to the CI as the initiating party, even though technically, Detective Kelly dialed the numbers.

This conversation confirmed, in Detective Kelly's view, that Defendant "was, indeed, involved in the cocaine business."   11/14 Tr. at 19-20.[11]

The phone call makes obvious that Defendant somehow had access to the San Juan residence despite not living there, which Detective Kelly confirmed during the evidentiary hearing.   11/14 Tr. at 66.   The CI told Detective Kelly that Defendant lived at the San Juan residence until "a couple of months prior to" her going to law enforcement, but at some point in August 2018 they "had a falling out . . . over money" and he moved out.   12/17 Tr. at 11.   Detective Kelly evidently never asked, and testified he was not told by the CI, exactly how Defendant still had access to the San Juan residence.   11/14 Tr. at 66, 90.   But, Detective Kelly testified that he asked the CI whether she was allowing Defendant to cook crack cocaine at the San Juan residence, and the CI "emphatically denied that."   11/14 Tr. at 89.   The CI stated that Defendant "was going into the residence without permission," although evidently he still had a key.   11/14 Tr. at 89, 90.

The CI told Detective Kelly the San Juan residence had a camera located in the doorway.   11/14 Tr. at 20.   The camera was set up so that she would receive a text message or notification on her cellular phone every time someone entered or exited the residence.   11/14 Tr. at 20, 67. Using the camera notifications, she told Detective Kelly when Defendant was entering the house.   11/14 Tr. at 20-21.

### 2.   Events of October 21, 2018

Because of the CI going on a trip to Las Vegas and Detective Kelly taking some time off work, there was a lapse in activity related to the investigation.   11/14 Tr. at 21.

---

[11]      During this call, the CI also asked something to the effect of "Can I get a quickie (or a quick end)" and made reference to "I can't get none." Gov.'s Ex. 1.   Detective Kelly testified he thought these references were not about drugs, but rather were about sexual relations.   11/14 Tr. at 65.

The next significant activity in the investigation occurred on October 21, 2018, when the CI called Detective Kelly around 11:15-11:30 that morning and was upset because her camera showed Defendant visiting the San Juan residence four or five times that week, and he was currently there.   11/14 Tr. at 21-23.   The CI wanted law enforcement to do something about it.   11/14 Tr. at 22.

Detective Kelly drove to the San Juan residence as quickly as he could.   11/14 Tr. at 23.   The CI called, telling Detective Kelly that Defendant was leaving the San Juan residence.   11/14 Tr.at 23.   Detective Kelly then saw Defendant's vehicle pull out from a nearby street onto Old San Mateo Road in East Palatka.   11/14 Tr. at 23; see Gov.'s Ex. 2 (map of area).   Detective Kelly was driving on the road when Defendant pulled out behind him.   11/14 Tr. at 24.   Anticipating that Defendant was likely heading to the Broadway residence, Detective Kelly drove to Broadway Street, parked near the residence, and waited.   11/14 Tr. at 24-25.

Defendant's vehicle arrived at the Broadway residence.   11/14 Tr. at 25. Defendant got out of the vehicle, and he was carrying a "bag . . . on his left side."   11/14 Tr. at 25.   Detective Kelly later that day obtained video footage and still shots from the CI of Defendant leaving the San Juan residence.   11/14 Tr. at 25, 66-67; see Gov.'s Ex. 3 (photographs). The still shots depict Defendant carrying a bag on his right shoulder, which "looked as if it matched" the one that Detective Kelly saw Defendant with that day.   Gov.'s Ex. 3; 11/14 Tr. at 25.

Believing that Defendant was carrying "[i]tems used to cut crack cocaine" in the bag, Detective Kelly called an assistant state attorney for guidance.   11/14 Tr. at 26.   The two discussed attempting to obtain a search warrant apparently for the Broadway residence,

but they agreed they would like to have more evidence before applying for one.   11/14 Tr. at 26, 78.   So, Detective Kelly engaged the CI to make another recorded call to Defendant. 11/14 Tr. at 27.

The CI called Defendant on the same date, October 21, 2018.   11/14 Tr. at 27. There were two calls that went unanswered, so the CI used another number she knew belonged to Defendant.   11/14 Tr. at 68-69.   The third time, the two connected.   11/14 Tr. at 69; see Gov.'s Ex. 4 (recording).   During this short call lasting just more than one minute, the CI accused Defendant of leaving "residue" in the San Juan residence.   Gov.'s Ex. 4.   Defendant clarified it was baking soda, not residue. Id.

After this call, Detective Kelly contacted the assistant state attorney again, and the two agreed they had probable cause to search Defendant's Broadway residence.   11/14 Tr. at 28-29; see Gov.'s Ex. 5 (search warrant for Broadway residence).   Using a "search warrant shell and a search warrant affidavit shell," Detective Kelly completed an application for authorization to search.   11/14 Tr. at 29; see 11/14 Tr. at 77; Gov.'s Ex. 5.

The assistant state attorney reviewed the draft and approved it without any comments or edits.   11/14 Tr. at 32, 77.   Detective Kelly then presented the application (on October 21, 2018) to the Honorable Joe Boatwright, County Judge for the Seventh Judicial Circuit (Putnam), who issued a search warrant that same day.   11/14 Tr. at 32; see Gov.'s Ex. 5 at 5.

### a.  Contents of Search Warrant Application

The search warrant application contains at least seven mistakes and omissions that were explored during the hearing.

**First**, it states in at least two places that application is being made by an "Affiant and Co-Affiant," when in fact, there was no co-affiant.   Gov.'s Ex. 5 at 6, 11 (emphasis added); see 11/14 Tr. at 30, 70.   In other places, however, just "Your Affiant" or "TFO Kelly" is used, and at the end, one "Affiant," Detective Kelly, signed the application.   See Gov.'s Ex. 5 at 7, 8, 9, 10, 11, 12.   Detective Kelly explained during the evidentiary hearing that the reference to a co-affiant was "standardized language" in the shell he uses that he did not delete.   11/14 Tr. at 30.

**Second**, the application indicates that certain information was obtained from "a proven, reliable confidential source," but provides no historical information about the alleged reliability of the CI, no information regarding her possible bias, no information regarding her being paid by law enforcement, and no criminal history.   See Gov.'s Ex. 5 at 7-10; 11/14 Tr. at 62.   Detective Kelly explained during the evidentiary hearing that this information was omitted because in "state search warrant applications[, law enforcement does not] put that information."   11/14 Tr. at 31, 62.

**Third**, the application mistakenly seeks to search a cellular phone.[12]   See Gov.'s Ex. 5 at 11-12.   Detective Kelly explained during the evidentiary hearing that the cellular phone information in the application is "boilerplate information that's put into a standardized search warrant."   11/14 Tr. at 31; see 11/14 Tr. at 70-72.   Detective Kelly testified that he did not know whether any cellular phone would have relevance in the investigation; they admittedly "didn't have enough probable cause" to search one.   11/14 Tr. at 31-32.   He

---

[12]      As explained in the Summary of Recommendation Section, supra, the Government is not intending to introduce any evidence of any seizure of a cellular phone (if one occurred), and the Government is not intending to search any cellular phone (to the extent it may have any in its possession).   The request to search phones in the warrant application is discussed only to comprehensively summarize the mistakes and omissions explored during the evidentiary hearing.

believes law enforcement did seize a cellular phone or phones, but he cannot say for sure. 11/14 Tr. at 32, 72. But, without sufficient probable cause, law enforcement never searched any phone(s). 11/14 Tr. at 32; see 11/14 Tr. at 72.

**Fourth**, the application states that Detective Kelly, upon receiving information from the CI that Defendant "was currently on Federal Probation for distribution of cocaine," confirmed that Defendant "was federally indicted for distribution of crack cocaine" for which he was ultimately "sentenced to 5 years in Federal prison followed by a 4 year probation sentence." Gov.'s Ex. 5 at 7. Although Defendant had been sentenced to a prison term for a federal drug crime, the details were inaccurate. Defendant had actually been indicted federally on December 22, 2006 for conspiracy to distribute cocaine base (not the substantive offense of distribution of crack cocaine), and he was sentenced on June 24, 2008 to 110 months imprisonment (not five years) and 48 months of supervised release (not probation). See Indictment, Minute Entry, Judgment (Doc. Nos. 1, 49, 50), Case No. 3:06-cr-419-J-20JBT; see also 11/14 Tr. at 63.

**Fifth**, the application states that "since [Defendant] had been released from federal prison, [the CI] has personally observed [Defendant] with up to half kilogram quantities of cocaine and large amounts of U.S. Currency estimating over $100,000.00," but it does not provide any specific timeframe for these observations or the basis of knowledge for the observations. Gov.'s Ex. 5 at 7. According to Detective Kelly during the hearing, the observations had occurred within the previous six months at the San Juan residence, prior to Defendant moving out. 11/14 Tr. at 63-64; 12/17 Tr. at 12.

**Sixth**, although the application states that on October 4, 2018, a controlled phone call was made from the CI to Defendant, it does not indicate the phone number called.

Gov.'s Ex. 5 at 8; see 11/14 Tr. at 68.   And, with respect to the calls made on October 21, 2018, the application does not indicate that the first two (using the same phone number as the October 4, 2018 call) went unanswered, or that the CI had to call another phone number to contact Defendant on this date.   See Gov.'s Ex. 5 at 9; 11/14 Tr. at 70.   Detective Kelly explained during the hearing that his practice is not to include phone numbers in warrant applications because "[i]t's typically not required" and omitting phone numbers protects the CI.   11/14 Tr. at 91.

**Seventh**, the application states that during the October 4, 2018 call, Defendant told the CI "that he had cocaine for sale and he was having problems finding high quality cocaine to be able to cook into crack cocaine."   Gov.'s Ex. 5 at 8.   Detective Kelly recognized during the evidentiary hearing that a reasonable interpretation of this language would be that Defendant literally used the words "cocaine" and "crack cocaine," when in fact, he did not.   11/14 Tr. at 75.   According to Detective Kelly, he verbally told the issuing judge that the telephone calls were "in street terminology," although this representation is not in the written application.   11/14 Tr. at 75.

Despite these mistakes and omissions, the affidavit sets forth other information that corroborates the CI and supports the state judge's probable cause finding.   The application represents that the CI advised law enforcement Defendant "was traveling to south Florida (specifically Melbourne, FL) and Jacksonville, Florida to obtain cocaine for sale."   Gov.'s Ex. 5 at 7. It discusses the CI stating that Defendant "regularly cooks the cocaine into 'crack cocaine' for sale in the San Mateo, Florida area and stores the crack cocaine at [the Broadway residence] where he lives."   Id. at 7-8.   It explains the CI contacted Detective Kelly on October 4, 2018 and told him Defendant had arrived at the

vacant San Juan residence.   Id. at 8.   It discusses the web camera, "viewable real time," and states that Defendant "entered the residence [that day] with a large bag."   Id.

The application represents the CI that day believed Defendant went to the San Juan residence with the intent to cook crack cocaine without her knowledge, that he stayed approximately an hour, and that the CI followed Defendant to the Broadway residence after he left the San Juan residence.   Id. It also states that the CI made a controlled call to Defendant and confronted him with finding alleged residue on the counter, to which he replied it was baking soda.   Id.   It advises that "baking soda is a prime ingredient for the process of cooking cocaine into crack cocaine."   Id.

The application then states that Defendant visited the San Juan residence approximately four times between October 15 and 19, 2018, each time arriving and leaving with the same bag.   Id.   Each time, the CI believed he was cooking crack cocaine, and each time, he did not have permission to be there.   Id.   According to the application, the GPS ping data for these dates showed that each time, he departed the San Juan residence "approximately 25 to 60 minutes after arrival and immediately travel[ed] to [the Broadway residence]."   Id. at 9.

The application goes on to state that the CI advised Detective Kelly on October 21, 2018 that Defendant was once again at the San Juan residence and had the same bag with him.   Id.   It discusses a controlled call in which Defendant admitted leaving baking soda on the counter of the San Juan residence and claims he took everything else with him.   Id.   And, it states that Detective Kelly conducted physical surveillance and observed Defendant travel from the San Juan residence to the Broadway residence and enter the Broadway residence with the bag in his possession.   Id.   Finally, the application

represents that Detective Kelly believed "the bag contained cocaine and utensils and ingredients needed to cook cocaine into crack cocaine and was being stored at [Defendant's Broadway residence.]"   Id. at 9-10.

### b.  Contact with Defendant, Statements, Search of Broadway Residence, and Arrest

Once in receipt of the search warrant, law enforcement devised a plan to execute it. 11/14 Tr. at 33-34.   Knowing from the CI that Defendant had a habit of fishing on Sundays at Shell Bluff on Crescent Lake in Palatka, Detective Kelly and another detective planned to meet Defendant there, while another team would go to the Broadway residence.   11/14 Tr. at 34.   Once Detective Kelly actually made contact with Defendant, he would advise the other team of officers and they would begin searching the Broadway residence.   11/14 Tr. at 34.

Detective Kelly drove to the lake in an unmarked car together with Detective Oscar Velez.   11/14 Tr. at 34, 83.   They were wearing "[p]lain clothes, jeans and shirts."   11/14 Tr. at 40; see 11/14 Tr. at 82.   When the two arrived, they saw Defendant's vehicle at the boat ramp and Defendant fishing near the water.   11/14 Tr. at 34, 82, 85.   Defendant had a teenager fishing with him who was later identified as his nephew, J.P.   See 11/14 Tr. at 35; 12/9 Tr. at 17-18 (J.P. testifying about fishing).

Generally, Detective Kelly's account of the following events at the lake is the same as J.P.'s, but they differ in two critical respects.   First, Detective Kelly testified he eventually asked Defendant for permission to search Defendant's vehicle, but J.P. testified he did not ask for permission.   Second, Detective Kelly testified he eventually read Defendant his Miranda warnings, but J.P. testified he did not.   These material inconsistencies are resolved after setting forth the relevant testimony.

After arriving at the lake, Detective Kelly called Defendant "by name" and Defendant walked over to him.   11/14 Tr. at 34; see 11/14 Tr. at 85; 12/9 Tr. at 18, 19.[13]   Detective Kelly identified himself and Detective Velez, explained they had a search warrant for Defendant's residence, and told him they "were trying to glean his cooperation."   11/14 Tr. at 35.   Defendant was cooperative.   11/14 Tr. at 35.   According to Detective Kelly, J.P. "was out of earshot of the conversation."   11/14 Tr. at 82.   J.P. had a different account, testifying he "could hear it perfectly."   12/9 Tr. at 19; see 12/9 Tr. at 21.   J.P. testified "they were speaking kind of loudly" and were not "that far away."   12/9 Tr. at 19.   Using a basketball court analogy, J.P. stated that—distance wise—he was probably standing from the end line to the three-point line away from the conversation.[14]   12/9 Tr. at 19.

Defendant was not in handcuffs, and he was not under arrest.   11/14 Tr. at 35.   It was decided that the officers and Defendant would go to the Broadway residence while the search was underway.   11/14 Tr. at 35.   Defendant was willing to go.   11/14 Tr. at 35, 86.   Given the situation and given that the nephew was there, Detective Kelly initially was going to permit Defendant to drive his own vehicle to the Broadway residence.   11/14 Tr. at 35.   Detective Kelly testified that prior to allowing Defendant to drive, he asked for permission to search the vehicle by saying something to the effect that he would "like to search [the] vehicle before [Detective Kelly and Detective Velez] allowed [Defendant] to drive back to his residence, just to make sure there was nothing . . . inside there that could cause any harm to any of the officers, and to check for anything illegal."   11/14 Tr. at 49-

---

[13]      Detective Kelly, having been a deputy in Putnam County for almost twenty years, is "very familiar" with Defendant and has "had interactions with him before in past investigations."   11/14 Tr. at 50-51; see 11/14 Tr. at 90-91.

[14]      In high school basketball, the three-point line is 19.75 feet from the basket.

50; <u>see</u> 11/14 Tr. at 35.   According to Detective Kelly, Defendant verbally agreed to the search, telling Detective Kelly "he didn't have any problem with that."[15]   11/14 Tr. at 50; <u>see</u> 11/14 Tr. at 35-36.   When Detective Kelly asked Defendant if he (Detective Kelly) needed to know about anything inside the vehicle, Defendant responded "no."   11/14 Tr. at 36.

J.P. remembers this aspect of the conversation differently.   He testified that Detective Kelly only "talk[ed] about how he was going to search the vehicle," 12/9 Tr. at 18, and asked, "Is there anything I'm going to find in the car?"   12/9 Tr. at 21 (internal quotations omitted).   J.P. stated that Detective Kelly did not ask for permission to search the vehicle.   12/9 Tr. at 24. But, importantly, J.P. stated on cross examination—in response to the question about what Detective Kelly might find—that Defendant said, "Go ahead and look."   12/9 Tr. at 26.

The undersigned finds that Detective Kelly did ask permission to search the vehicle. To the extent J.P. testified otherwise, his testimony is discredited.   J.P. admitted that he heard Detective Kelly ask, "Is there anything I'm going to find in the car?"—but his testimony was more general on what proceeded that specific phrase.   Although he later testified affirmatively that Detective Kelly did not ask permission to search the vehicle, the undersigned finds he was either mistaken or intentionally misleading with this testimony. J.P. admitted there were "some points" when Detective Kelly "would get quiet," 12/9 Tr. at 25-26, so there is certainly a possibility he did not hear Detective Kelly ask for permission to search.   Although he believes he "could hear everything," 12/9 Tr. at 25, he simply

---

[15]      Although he obtained verbal consent to search the vehicle, Detective Kelly did not memorialize it with a written consent form.   11/14 Tr. at 92.   He testified a form is not required by either the Putnam County Sheriff's Office or DEA.   11/14 Tr. at 92.

cannot know what he did not hear during these quiet points.   Regardless, and importantly, even J.P. agreed that Defendant invited the law enforcement officers to "[g]o ahead and look."   12/9 Tr. at 26.   The undersigned finds that Defendant consented to the search of the vehicle.

The search, lasting approximately three minutes, yielded "illegal contraband" in the form of suspected crack cocaine found inside an alcove behind a panel underneath the steering wheel.   11/14 Tr. at 35-36, 85.   (Detective Kelly knew to look in that particular place in the vehicle because the CI told him that was where Defendant hid illegal substances.   11/14 Tr. at 36.)   J.P. testified that during the search, he actually moved "a couple more feet" closer because he "wanted to hear what was going on."   12/9 Tr. at 22.

According to Detective Kelly, just after the suspected crack cocaine was found in the vehicle, he read Defendant his Miranda rights from a standardized card provided by the Putnam County Sheriff's Office.   11/14 Tr. at 37, 39; 6/23 Tr. at 8-9; see Gov.'s Ex. 6 (Miranda warning card).   Detective Kelly testified he did this because "[t]he discovery of the crack cocaine . . . was going to lead into criminal  - - questions that may incriminate [D]efendant."   11/14 Tr. at 39; see 11/14 Tr. at 92.   The Miranda warnings that Detective Kelly testified he gave are as follows:

> You have the right to remain silent.   Anything you say can and will be used against you in a court of law.   You have the right to talk to a lawyer and have him present with you while you're being questioned.   If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish.   You can decide at any time to exercise these rights and not answer any questions or make any statements.
>
> . . .
>
> Do you understand each of these rights I have explained to you?

. . .

>Having these rights in mind, do you wish to talk to us now?

11/14 Tr. at 37-38; 6/23 Tr. at 8-9; see Gov.'s Ex. 6 (Miranda warning card).[16]   Defendant

answered "Yes" or "Yeah" to both questions.   11/14 Tr. at 38.   According to Detective

Kelly, Defendant did not appear to have any difficulty understanding his rights, and he did

not appear to be under the influence of anything.   11/14 Tr. at 38-39, 52.

Detective Kelly admitted under cross examination that his report from the day in

question does not document him reading Defendant his Miranda rights.   11/14 Tr. at 80-

81.   Nor did Detective Kelly have Defendant sign a written Miranda waiver form.   11/14

Tr. at 81, 92. He testified that a form is not required by DEA or the Putnam County Sheriff's

Office.   11/14 Tr. at 92.

J.P. has a different account than Detective Kelly's about the alleged Miranda

warnings: they did not happen.   12/9 Tr. at 21.   When asked, "[D]uring this time did you

hear Detective Kelly give your uncle his Miranda rights, what you see on TV about the - -"

J.P. responded, "Oh like, the - - no, I did not hear any of that."   12/9 Tr. at 21.   When later

---

[16]      During the November 14, 2019 portion of the evidentiary hearing, Detective Kelly testified as to the required warning about appointment of a lawyer that he advised Defendant: "If you cannot afford to hire a lawyer, one will be appointed to represent you after any questioning, if you wish." 11/14 Tr. at 37.   Of course, it is well established under Miranda v. Arizona, that prior to any custodial interrogation, an individual must be advised: "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."   384 U.S. 436, 478-79 (1966) (emphasis added).   When the undersigned reviewed the transcript from November 14, 2019, it became apparent that either Detective Kelly misspoke and said "after" instead of "before" (either during his testimony, or when he actually advised Defendant, or both) or that there was a potential issue with the Miranda warnings that Detective Kelly testified he gave.   At that time, the Miranda card from which Detective Kelly read was not in evidence.   So, the undersigned reopened the evidentiary hearing to hear from Detective Kelly again and to examine the card.   See Order (Doc. No. 88), entered June 16, 2020.   During the reopened hearing, held on June 23, 2020, Government's exhibit six, the Miranda card, was received into evidence without objection. The card states "prior to any questioning," in compliance with Miranda.   See Gov.'s Ex. 6.   Detective Kelly credibly testified during the June 23, 2020 hearing that he read directly and accurately from the card when he advised Defendant of his Miranda rights on October 21, 2018, and that he must have misread it while testifying on November 14, 2019.   6/23 Tr. at 10-11.   The undersigned credits Detective Kelly's explanation.

asked if Detective Kelly read Defendant his <u>Miranda</u> warnings after the vehicle was searched, he responded, "No, ma'am," confirming he could "still hear their conversations at that point."   12/9 Tr. at 22-23.   But, on cross examination, J.P. admitted he "actually turned away" as the search was ending "because [he] didn't want to see anything."   12/9 Tr. at 26.   He testified he "heard Detective Kelly say, 'Well, this is what I found.'"   12/9 Tr. at 26.   Then he heard Detective Kelly say, "'Go ahead and call your nephew over.'"   12/9 Tr. at 26.   J.P. did not know what was found during the search.   12/9 Tr. at 26.

The undersigned finds that Detective Kelly did read Defendant his <u>Miranda</u> warnings after the vehicle was searched.   J.P.'s testimony to the contrary is discredited.   J.P. admittedly disengaged and turned away after the search of the vehicle because he did not want to see the results of the search.   He did not learn the results of the search.   Detective Kelly testified it was after the search that he read Defendant his <u>Miranda</u> rights.   J.P., therefore, easily could have missed the <u>Miranda</u> rights because of his affirmative efforts not to pay attention at this point.   Or, he could have intentionally tried to mislead the Court on the matter (a possible but less likely scenario).   Detective Kelly credibly testified about the <u>Miranda</u> rights, the reasons he gave them at the time that he did, and Defendant's responses thereto.   Detective Kelly's recollection was rather good on these details.   Although Detective Kelly failed to document reading the <u>Miranda</u> rights (either with a written form or in his report), his failure to take such action does not diminish his credible testimony in this particular instance.[17]

---

[17]     <u>See</u> <u>United States v. Smith</u>, 688 F.3d 730, 734 n.10 (11th Cir. 2012) (stating that "[t]he mere fact an incident report omits certain details is not sufficient to render the officer's testimony concerning the underlying action facially implausible" (quoting <u>United States v. Mendoza</u>, 677 F.3d 822, 828 (8th Cir. 2012))).

Defendant made at least one incriminating statement after the search: when asked "if there was anything in the residence that [law enforcement was] going to find," Defendant responded, "A lot of cocaine."   11/14 Tr. at 39 (internal quotation omitted).   This statement was not recorded.   11/14 Tr. at 39.

Even after finding the suspected crack cocaine and despite reading Defendant his <u>Miranda</u> rights, Detective Kelly did not place Defendant under arrest.   11/14 Tr. at 36. But, Defendant would not have necessarily been free to leave had he tried.[18]   Detective Kelly told Defendant that he was no longer comfortable with Defendant driving his vehicle to the Broadway residence.   11/14 Tr. at 36.   Defendant agreed to ride with Detective Kelly to the residence and to let Detective Velez drive his vehicle with J.P. as a passenger in that vehicle.   11/14 Tr. at 37, 39.

The entire encounter at the lake lasted no more than ten or fifteen minutes.   11/14 Tr. at 39.   Although Detective Kelly and Detective Velez were armed, they never drew their weapons or threatened to use physical force.   11/14 Tr. at 40.   At least Detective Kelly's firearm was not even visible: it was clipped to his belt on the inside of his pants.   11/14 Tr. at 51, 82.   The officers made no promises to Defendant.   11/14 Tr. at 40.   Detective Kelly described the tone of the conversation at the lake as "relatively relaxed."   11/14 Tr. at 40; <u>see</u> 11/14 Tr. at 52.   At no point did Defendant indicate he did not wish to speak to the officers.   11/14 Tr. at 52.

---

[18]       When asked if Defendant would have been free to leave at this point had he tried, Detective Kelly testified he "[m]ost likely" would have detained Defendant while determining with the appropriate supervisors whether he should arrest Defendant.   11/14 Tr. at 84.   Later, Detective Kelly was confronted with his report in which he wrote that Defendant "was free to leave the scene" at this point, and Detective Kelly testified that because Defendant "agreed to [go] to the residence with [the officers, i]t never became an issue."   11/14 Tr. at 86.

Detective Kelly and Detective Velez drove to the Broadway residence as planned, with Defendant in Detective Kelly's passenger seat and J.P. in Defendant's vehicle with Detective Velez.   11/14 Tr. at 39, 83; 12/9 Tr. at 23.   Defendant was not handcuffed in the car.   11/14 Tr. at 84.   They stopped to drop off J.P. to another officer, who took him home.   11/14 Tr. at 39-40; 12/9 Tr. at 23.   Evidently while in the vehicle with Detective Kelly, Defendant made additional statements of import.   11/14 Tr. at 40-41.   He told Detective Kelly that law enforcement would find a hand safe at the Broadway residence with "half a kilo of cocaine" inside, along with "[m]arijuana and some money."   11/14 Tr. at 40-41.   He also said "that he was sourcing cocaine from a source out of Ocala."   11/14 Tr. at 41.

When Detective Kelly, Detective Velez, and Defendant arrived at the Broadway residence, the other team of four law enforcement officers had already entered.   11/14 Tr. at 41.   These members were dressed in plain clothes with outer carrier vests, and they were armed.   11/14 Tr. at 41-42.   Members of the search team briefed Detective Kelly that they had at that point "found marijuana," as well as "some money in a  - - some bank bags in the closet," and "a pistol."   11/14 Tr. at 41.

Defendant went inside with Detective Kelly and led him to Defendant's bedroom where the hand safe was supposed to be located.   11/14 Tr. at 41-42.   Defendant provided the key to Detective Kelly.   11/14 Tr. at 42.   Surprisingly, the hand safe was not where Defendant thought it would be (underneath his bed).   11/14 Tr. at 42.   Defendant thought perhaps someone had broken in and taken it.   11/14 Tr. at 42.

Defendant's room did contain a larger safe.   11/14 Tr. at 42, 44.   He provided the combination to that safe, and inside, law enforcement "found a bunch of cash."   11/14 Tr. at 42, 44.

Defendant's mother and father were present at the Broadway residence during the execution of the search warrant.   11/14 Tr. at 42.   Both denied knowing anything about the missing hand safe.   11/14 Tr. at 42.   Defendant, too, explained that he did not think his parents knew anything about the safe.   11/14 Tr. at 43.   Detective Kelly eventually found the hand safe in Defendant's parents' "master bedroom buried underneath some laundry in the closet."   11/14 Tr. at 43.   Later, Detective Kelly learned that when the search team first knocked on the door that day, Defendant's father answered.   11/14 Tr. at 45. When law enforcement told Defendant's father they had a search warrant for the residence, he closed the door.   11/14 Tr. at 45.   "[T]here was a lapse in the time that [Defendant's] father came back and reopened the door to allow the detectives in."   11/14 Tr. at 45.   Detective Kelly believes that the father hid the safe "in an attempt to keep his son from getting in trouble."   11/14 Tr. at 46.

Defendant confirmed that the safe found in the master bedroom closet was the one containing cocaine.   11/14 Tr. at 43.   Detective Kelly opened the safe with the key that Defendant had provided; inside, there was approximately half a kilogram of suspected cocaine, along with some "cooked-up crack cookies" weighing about an ounce.   11/14 Tr. at 43-44.

In addition to the above-discussed items, law enforcement found ammunition and drug paraphernalia in a separate room than the rooms already discussed, money bags in Defendant's bedroom hanging from a closet door, about four pounds of marijuana in

Defendant's bedroom closet, about fourteen total ounces of marijuana in two different drawers in his bedroom, crack cocaine cooking utensils and plastic bags inside a handbag in Defendant's bedroom, and a Taurus PT-22 semiautomatic handgun in a drawer in Defendant's bedroom.   11/14 Tr. at 44-45.

Ultimately, law enforcement arrested both Defendant and his father that day.   11/14 Tr. at 46.   Defendant was charged with trafficking in cocaine, possession of marijuana, and possession of a firearm by a convicted felon.   11/14 Tr. at 47.   Defendant's father was charged with trafficking in cocaine.   11/14 Tr. at 47.

At no time during the search or otherwise on October 21, 2018 did Detective Kelly draw his weapon, and he did not see any other law enforcement officers draw their weapons.   11/14 Tr. at 48.   Detective Kelly did not threaten or use physical force against Defendant, and he did not hear or see anyone else do that.   11/14 Tr. at 48.   No promises were made to get Defendant to speak to law enforcement that day.   11/14 Tr. at 48.   The tone remained conversational throughout the search.   11/14 Tr. at 48-49.

Defendant, born in 1980, was approximately thirty-eight years old on October 21, 2018.   See Pretrial Services Report (Doc. No. S-16; "Pretrial Report"); 11/14 Tr. at 51. He reported to the Pretrial Services Officer and the Court upon his federal arrest that he has never been diagnosed with a mental health condition.   Pretrial Report at 2; see Minute Entry for Initial Appearance (Doc. No. 7).[19]   He stated he has ten years of schooling and has obtained his GED.   He reads, writes, and understands English.   The Pretrial Report reflects a lengthy criminal history, dating back to 1995, when Defendant was fourteen-years-old.   See Pretrial Report at 3-9.

---

[19]        The initial appearance has not been transcribed by a court reporter.

# V.   Discussion

## A.  Parties' Positions

As to the search warrant application, Defendant contends that its mistakes and omissions are problematic.  <u>See</u> Motion at 1-2, 4-5; Defendant's Memo at 2.  He also argues that the information that is set forth is lacking in probable cause because the application mainly relies on "the conclusory statements" of the CI.  Motion at 3.  Further, he states that the "little substance produced to corroborate the [CI's] information was related solely to details of a different dwelling – the [CI's] property – than the one to be searched."  <u>Id.</u>; <u>see</u> <u>id.</u> at 5, 7.  In other words, the application did not demonstrate the required nexus between the place to be searched and the probability that evidence or contraband would be found there.  <u>See</u> <u>id.</u> at 7-8.  Defendant also contends that the Government may not rely on the good faith exception to suppression because Detective Kelly admittedly presented evidence to the issuing judge that was outside the four corners of the warrant application: he told the judge the telephone calls were "in street terminology," although this representation is not in the written application.  Defendant's Memo at 2; 11/14 Tr. at 75.

Responding, the Government contends that the mistakes and omissions in the application were inadvertent, immaterial, and at most negligent, so they do not invalidate the warrant.  Response at 9-11, 13-14; Government's Memo at 2.  The Government also argues the warrant application sufficiently establishes probable cause to believe evidence would be found at the place to be searched.  Response at 11-15; Government's Memo at 1-5.  Finally, the Government asserts alternatively that law enforcement reasonably relied on the warrant in good faith, so suppression is not warranted.  Response at 15-16.

As to the statements, Defendant asks for them all to be suppressed, contending that Detective Kelly did not read him <u>Miranda</u> rights.   Defendant's Memo at 4.   He also argues his statements "after he was taken away from the boat dock" were involuntary.   Motion at 6, 10. Defendant argues alternatively that his statements are "fruits of the poisonous tree" because of the alleged lack of probable cause to support the search warrant.   <u>Id.</u> at 6-7. In support, he argues "[t]here were no grounds to detain [Defendant] at the fishing dock apart from the search warrant."   <u>Id.</u> at 7.   Responding, the Government contends that under the totality of the circumstances, the statements were voluntary and need not be suppressed.   Response at 17-19; Government's Memo at 6.

**B.   Analysis**

**1.   Search Warrant[20]**

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,' and it provides that 'no Warrants shall issue, but upon probable cause.'" <u>United States v. Joseph</u>, 709 F.3d 1082, 1099 (11th Cir. 2013) (alteration in original) (quoting U.S. Const. amend. IV).   "Probable cause to support a search warrant exists when the totality of the circumstances allows the conclusion that 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"   <u>United States v. Kapordelis</u>, 569 F.3d 1291, 1310 (11th Cir. 2009) (quoting <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983); <u>United States v. Brundidge</u>, 170 F.3d 1350, 1352 (11th Cir. 1999)).   When law

---

[20]   "Where a search is conducted under the authority of a warrant, the defendant challenging the search carries the burden of showing the warrant to be invalid."   <u>United States v. Osborne</u>, 630 F.2d 374, 377 (5th Cir. 1980) (citation omitted).   (In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.)

enforcement seeks a warrant to search a person's residence, "the affidavit must supply the authorizing [judge] with a reasonable basis for concluding that [the d]efendant might keep evidence of his crimes at home, i.e., a safe yet accessible place." Id. (quotation and citation omitted).  In the absence of "an allegation that the illegal activity occurred at the location to be searched, for example the home, . . . 'the affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity.'"  Id. (citing, e.g., United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002)).

An issuing judge's "determination of probable cause should be paid great deference by reviewing courts." Gates, 462 U.S. at 236 (citation omitted) (observing that "after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review"); see also Joseph, 709 F.3d at 1093 (stating that "[w]e afford great deference to the determination of a[n issuing] judge that a search warrant affidavit is supported by probable cause, and we uphold the determination of the [issuing] judge so long as he had a substantial basis for concluding that a search would uncover evidence of wrongdoing" (citation and internal quotation marks omitted)). Review of the sufficiency of the evidence supporting probable cause is generally limited to the information that was presented to the judicial officer who issued the warrant. United States v. Lockett, 674 F.2d 843, 845 (11th Cir. 1982).

A search warrant is void if the affidavit supporting such warrant contains "deliberate falsity or . . . reckless disregard" for the truth and if "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause." Franks v. Delaware, 438 U.S. 154, 156, 171 (1978); see also Madiwale v. Savaiko, 117

F.3d 1321, 1326 (11th Cir. 1997). "The reasoning in Franks also applies to information omitted from warrant affidavits." Madiwale, 117 F.3d at 1326. So, if an affidavit "contains omissions 'made intentionally or with a reckless disregard for the accuracy of the affidavit,'" a warrant may be invalidated. Id. at 1326-27 (quoting United States v. Martin, 615 F.2d 318, 329 (5th Cir. 1980)). "A party need not show by direct evidence that the affiant [made] an omission recklessly," because if "facts omitted from the affidavit are clearly critical to a finding of probable cause," then "recklessness may be inferred from proof of the omission itself." Id. at 1327 (quoting Martin, 615 F.2d at 329). On the other hand, "[o]missions that are not reckless, but are instead negligent, or insignificant and immaterial, will not invalidate a warrant." Id. (citations omitted). "Indeed, even intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause." Id. (citation omitted).

There is "a two-part test" to determine "the sufficiency of an affidavit based on hearsay information: first, the affidavit must provide information regarding the reliability of the information provided by the informant; second, the affidavit must provide information regarding the credibility of the informant."   United States v. Haimowitz, 706 F.2d 1549, 1555 (11th Cir. 1983) (citation omitted); see Aguilar v. Texas, 378 U.S. 108 (1964).   In examining the sufficiency of an affidavit based on information provided by an informant, "the informant's 'veracity,' 'reliability' and 'basis of knowledge' are all highly relevant in determining the value of his report." Gates, 462 U.S. at 230. These factors are to be "understood as relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable cause determinations: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to

the other, or by some other indicia of reliability." <u>Id.</u> at 233 (citation omitted). Even if an affidavit omits felony convictions and "numerous bad acts" of an informant, if it contains other information that corroborates an informant's credibility, it is not so defective so as to be lacking in probable cause. <u>Haimowitz</u>, 706 F.2d at 1555. Indeed, if an "affidavit contains detailed, firsthand information that is specific in its allegations, and is therefore self-corroborating," the affidavit is "sufficient on its face to support [a] finding of probable cause by the [issuing judge]." <u>Id.</u> (quotation omitted).

Here, the mistakes and omissions in the warrant application do not render the warrant unsupported by probable cause.   First, as to the mistaken "Affiant and Co-Affiant" phrase used twice in the application, Gov.'s Ex. 5 at 6, 11, in context, it is clear these are scrivenor's errors.   In at least five other places, the phrase is not used and "Your Affiant" or "TFO Kelly" is used.   <u>Id.</u> at 7, 8, 9, 10, 11.   And, at the end, one "Affiant," Detective Kelly, signed the application.   <u>Id.</u> at 12.

Second, the failure to provide any historical information about the CI's alleged reliability, no information about a possible bias, no information about her being paid by law enforcement, and no criminal history, <u>see</u> Gov.'s Ex. 5 at 7-10, is troubling, especially given Detective Kelly's stated rationale that this information is not required in state search warrant applications.   <u>See</u> 11/14 Tr. at 31, 62.   In other words, Detective Kelly purposely omitted this information because he did not deem it necessary.   But, the Supreme Court says otherwise: "the informant's 'veracity,' 'reliability' and 'basis of knowledge' <u>are all highly relevant</u> in determining the value of his [or her] report." <u>Gates</u>, 462 U.S. at 230 (emphasis added).

Although it is troubling that Detective Kelly omitted this information, the warrant application nonetheless contains sufficient evidence that independently corroborates the CI's statements. [21]   See Haimowitz, 706 F.2d at 1555; Gates, 462 U.S. at 230, 233.   That evidence is set forth in detail in the Findings of Fact Section, but in sum, the application corroborates the CI's information with Detective Kelly's personal observations of Defendant traveling to the Broadway residence with a brown bag after having been at the San Juan residence on October 21, 2018; controlled phone calls in which Defendant admits to the CI leaving baking soda on the counter of the San Juan residence; and GPS ping data showing Defendant arriving at the San Juan residence multiple times and leaving within twenty-five to sixty minutes each time, returning to the Broadway residence.   See Gov.'s Ex. 5 at 7-10.   These representations independently corroborate the CI.   Together with the CI's knowledge that Defendant resides at the Broadway residence, there existed probable cause to search the Broadway residence.

Third, the application mistakenly seeks to search a cellular phone.   See Gov.'s Ex. 5 at 11-12.   As already noted, no cellular phones have been searched, and the Government does not intend to search a phone or introduce evidence of any seizure of cellular phones during the execution of the search warrant.   Detective Kelly's admitted accidental inclusion of this request in the application—which caused a judge to issue a search warrant authorizing the search of cellular phones—is once again bothersome.   But, the mistake is inconsequential in this particular instance given the parties' agreement that the request to suppress the seizure and search of any cellular phones is moot.

---

[21]   The undersigned notes that although in this case Detective Kelly's failure to include this information does not render the search warrant invalid, Detective Kelly's practice in drafting affidavits is troublesome. It is an agent's duty to provide the issuing judge with all the information necessary to evaluate an application for a search warrant and determine the credibility and reliability of any informants.

Fourth, although the application accurately conveyed that Defendant had been sentenced to a prison term for a federal drug crime, the details of the conviction and sentence were inaccurate.   Getting these details wrong was sloppy, and probably negligent.   But, the representation put the issuing judge on notice of what really mattered: Defendant's federal drug conviction and his current supervision by a federal court after serving a prison term for that crime.   The incorrect details do not render the warrant application unsupported or deficient.   See United States v. Glinton, 154 F.3d 1245, 1256 (11th Cir. 1998) (stating that "minor discrepancies in an affidavit should not subvert an officer's good-faith revelations of facts establishing probable cause") (citations omitted); see also United States v. Brooks, 594 F.3d 488, 490 (6th Cir. 2010) (quoting United States v. Ventresca, 380 U.S. 102, 108 (1965) ("Although sloppiness may raise flags, it is not in any way fatal because search warrants 'are normally drafted by nonlawyers in the midst and haste of a criminal investigation.'")).

Fifth, the application discusses the personal observations of the CI but does not provide any specific timeframe for these observations or how the observations were allegedly made.   These omitted details would have bolstered a probable cause finding: the CI had seen Defendant at the San Juan residence with up to half kilogram quantities of cocaine and large amounts of U.S. Currency within six months of the warrant application. So, the failure to provide them is perplexing.   Nevertheless, for the reasons previously stated, the CI was sufficiently corroborated by independent evidence.   The failure to provide a timeframe or context for the CI's observations does not invalidate the warrant.

Sixth, the application states that controlled phone calls were made to Defendant, but it does not provide phone numbers and does not indicate that on one occasion, the CI

had to call a different number when she could not reach Defendant at the first one.   This attribution information, that would have shed light on the details of Defendant's phone usage, does not detract from the probable cause to search the Broadway residence given the other information set forth in the application.

Seventh and finally, the application states that Defendant told the CI "he had cocaine for sale and was having problems finding high quality cocaine to be able to cook into crack cocaine."   But, in reality, Defendant used no such terms.   Detective Kelly testified that he verbally told the issuing judge that the telephone calls were "in street terminology," but this representation is not in the warrant application.   11/14 Tr. at 75.   Detective Kelly should have made this representation in the actual warrant application.   But, the omission of this information is immaterial.   The issuing judge did not abandon his neutral role in receiving this oral clarification about the "street terminology."   Moreover, even if Detective Kelly had not made the clarification, had Detective Kelly disclosed in the warrant application the use of "street terminology" and explained that based on his experience the code words referred to cocaine and crack cocaine, the issuing judge's conclusion that there was probable cause to issue the search warrant would not have changed. Accordingly, under the facts of this case, Detective Kelly's failure to specify in the application that street terminology was used does not result in a lack of probable cause.

For all of the foregoing reasons, Defendant's challenge to the search warrant fails. Given this finding, the undersigned need not address the Government's alternative argument that law enforcement relied on the search warrant in good faith.   Nor does the undersigned need to address Defendant's argument that his statements are "fruits of the

poisonous tree" because of the alleged lack of probable cause to support the search warrant.   Motion at 6-7.[22]

## 2.   Statements

The requirement that a confession be voluntary to be admitted into evidence is based on the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment. Dickerson v. United States, 530 U.S. 428, 433 (2000). In Miranda v. Arizona, 384 U.S. 436, 478-79 (1966), the United States Supreme Court announced a "prophylactic" rule to protect against violations of the Self-Incrimination Clause. Withrow v. Williams, 507 U.S. 680, 690-91 (1993) (collecting cases); see also Dickerson, 530 U.S. at 437-38. Under Miranda, an individual taken into custody must be advised that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." Miranda, 384 U.S. at 478-79.

These Miranda warnings "must precede any 'custodial interrogation.'" Garcia v. Singletary, 13 F.3d 1487, 1489 (11th Cir. 1994) (quoting Miranda, 384 U.S. at 444). "A 'custodial interrogation' occurs whenever law enforcement officers question a person after taking that person into custody or otherwise significantly deprive a person of freedom of action." Id. (quoting Miranda, 384 U.S. at 444). Miranda warnings are not required, however, during "[g]eneral 'on-the-scene questioning,' . . . concerning the facts and

---

[22]   In any event, the undersigned disagrees with Defendant's contention that "there were no grounds to detain [him] at the fishing dock apart from the search warrant."   Motion at 7.   Aside from the information specifically set forth in the search warrant application, law enforcement had a substantial basis upon which Defendant could be detained, or even arrested, at the lake (as summarized in detail in the Findings of Fact Section).

circumstances surrounding a crime or other general questioning of citizens during the fact-finding process . . . ." Id. (quoting Miranda, 384 U.S. at 477). Further, "[v]olunteered statements of any kind are not barred by the Fifth Amendment . . . ." Miranda, 384 U.S. at 478.

Two distinct questions may arise in the context of a suspect's statements to the police: whether the suspect validly waived his or her Miranda rights; and whether the suspect's statements to the police were voluntary. See Dickerson, 530 U.S. at 444 (stating that the "requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry" (dicta)).

A suspect may waive his or her Miranda rights, "provided the waiver is made voluntarily, knowingly, and intelligently." Miranda, 384 U.S. at 444. Courts look to two areas of inquiry to determine whether a waiver of a suspect's constitutional rights was valid:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude Miranda rights have been waived.

Moran v. Burbine, 475 U.S. 412, 421 (1986) (quoting Fare v. Michael C., 442 U.S. 707, 725 (1979)).

Aside from the validity of a waiver of one's Miranda rights, due process requires that a confession be voluntary to be admitted at trial. See Colorado v. Connelly, 479 U.S. 157, 163 (1986). In assessing whether a confession is voluntary, courts look to the totality of the circumstances to determine "whether a defendant's will was overborne at the time he confessed," or whether the confession was the product of rational intellect and free will.

Reck v. Pate, 367 U.S. 433, 440 (1961) (citations omitted); see also Arizona v. Fulminante, 499 U.S. 279, 285-86 (1991); Connelly, 479 U.S. at 176-77 (Brennan, J., dissenting).   The inquiry typically focuses on police overreaching. Connelly, 479 U.S. at 163-64. Relevant factors include the defendant's age, the defendant's education, the defendant's intelligence, whether Miranda warnings were given, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as deprivation of food or sleep. See, e.g., Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). The voluntariness inquiry with respect to confessions is highly similar, if not identical, to the inquiry into the voluntariness of a waiver of Miranda rights. Connelly, 479 U.S. at 169-70 (stating that "[t]here is obviously no reason to require more in the way of a 'voluntariness' inquiry in the Miranda waiver context than in the Fourteenth Amendment confession context"); United States v. Cristobal, 293 F.3d 134, 140 (4th Cir. 2002) (stating that courts "engage in the same inquiry when analyzing the voluntariness of a Miranda waiver as when analyzing the voluntariness of statements under the Due Process Clause" (citation omitted)).

Here, there is a question of whether Defendant was in custody during the relevant time.   The undersigned assumes (without deciding) that he was not free to leave and was in custody.   Given this assumption, Miranda warnings were required.   See Garcia, 13 F.3d at 1489 ("Miranda warnings must precede any 'custodial interrogation.'" (quoting Miranda, 384 U.S. at 444)).   The undersigned has already found as a factual matter that Detective Kelly read Defendant his Miranda rights at the lake just after finding illegal substances in Defendant's vehicle.   These Miranda rights, read from a standardized card, adequately complied with Miranda.   Defendant did not appear to have any difficulty

understanding the rights, and he did not appear to be under the influence of anything.[23] 11/14 Tr. at 38-39, 52.   After being read his <u>Miranda</u> rights, Defendant affirmatively indicated that he understood them and wished to speak with the law enforcement officers. 11/14 Tr. at 38.   The record does not reflect that Defendant asked any questions about his <u>Miranda</u> rights or that he asked to clarify them. <u>See</u> 11/14 Tr. at 38.   Defendant did not invoke his right to an attorney or his right to remain silent at any point.   <u>See, e.g.</u>, 11/14 Tr. at 38, 52.   Defendant's decision to waive his <u>Miranda</u> rights was not a result of coercion, intimidation, or deception.   Under the circumstances, the undersigned finds that Defendant knowingly, voluntarily, and intelligently waived his <u>Miranda</u> rights.

Moreover, the totality of the circumstances show that Defendant's statements that day were voluntary.   The encounter at the lake was "relatively relaxed."   11/14 Tr at 40; <u>see</u> 11/14 Tr. at 52.   Although the officers were armed, they never drew their weapons or threatened to use physical force.   11/14 Tr. at 40.   They made no promises.   11/14 Tr. at 40.   Defendant told Detective Kelly after the vehicle search that law enforcement would find "[a] lot of cocaine" in the Broadway residence.   11/14 Tr. at 39.

Defendant agreed to ride with Detective Kelly to the Broadway residence.   11/14 Tr. at 39, 83.   He sat in the passenger's seat, and he was not handcuffed.   11/14 Tr. at 84.   During this ride, he made additional statements.   He told Detective Kelly where inside the Broadway residence to find a safe containing cocaine, marijuana, and money.   11/14

---

[23]     Defendant did tell the Pretrial Services Officer upon his federal arrest that he used ecstasy on October 21, 2018.   Pretrial Report at 2.   There was no such evidence presented during the evidentiary hearing.   Without knowing the circumstances of this alleged use, the Court is left with the credible testimony of Detective Kelly that Defendant was responsive that day and did not appear to be under the influence of anything.   In addition, the undersigned notes that Defendant had obviously driven himself and his minor nephew, J.P., to the lake that day.

Tr. at 40-41.   He also told Detective Kelly he was "sourcing" cocaine from someone in Ocala.   11/14 Tr. at 31.

Once inside the Broadway residence, Defendant led Detective Kelly to his bedroom to find the safe.   11/14 Tr. at 41-42. He provided the key.   11/14 Tr. at 42.   When the safe was not found in the bedroom, he told Detective Kelly maybe someone had broken in and taken it.   11/14 Tr. at 42. He provided the combination to a larger safe that was found inside his bedroom.   11/14 Tr. at 42, 44.   When the other safe was located, he confirmed it was the one containing cocaine.   11/14 Tr. at 43.

At no time during the search of the Broadway residence or otherwise did Detective Kelly draw his weapon, and he did not see anyone else draw weapons.   11/14 Tr. at 48. He did not threaten or use physical force, and he did not see or hear anyone else do that. 11/14 Tr. at 48.   He did not make any promises to Defendant.   11/14 Tr. at 48.   The tone remained conversational.   11/14 Tr. at 48-49.   The entirety of the circumstances shows that Defendant was cooperative with law enforcement.

Further, Defendant's age (approximately thirty-eight years old), education (ten years of schooling and GED), absence of mental condition, and lengthy criminal history demonstrate that he was fully aware of what was happening that day and the potential consequences of making statements.

For all of the foregoing reasons, Defendant's October 21, 2018 statements were voluntary.

## VI.   Conclusion

After due consideration, it is

**RECOMMENDED THAT:**

38

Defendant's Motion to Suppress Physical Evidence Seized and to Suppress Statements and Memorandum of Law (Doc. No. 24), be **DENIED** as to all evidence the Government seeks to introduce at trial (physical evidence (except any cellular phone) seized during the execution of the search warrant on October 21, 2018, and statements made by Defendant on October 21, 2018) and **DENIED AS MOOT** as to evidence the Government does not seek to introduce (any seizure or search of a cellular phone).

**RESPECTFULLY RECOMMENDED** at Jacksonville, Florida, on July 9, 2020.

_James R. Klindt_
**JAMES R. KLINDT**
United States Magistrate Judge

kaw
Copies to:

Hon. Harvey E. Schlesinger
Senior United States District Judge

Assistant United States Attorney (Washington)
Lisa Call, Esquire